## STATE v. MICHAEL BUSSINGER.

230 N. W. 2d 601.

June 13, 1975—No. 44758.

*Arvid Wendland,* for appellant.
*Wallace A. Thompson,* for respondent.

OTIS, JUSTICE.

This is an appeal from an order of the district court granting defendant's motion to vacate a judgment adjudicating him to be the father of a child born out of wedlock. The issue is whether defendant has made a timely motion supported by evidence adequate to justify the trial court's order. We hold that he has not and reverse.

On March 12, 1970, defendant was served with a warrant initiating these proceedings. He appeared in municipal court with his attorney on March 17, 1970. The matter was continued until after the birth of the child on May 3, 1970.

Defendant made his first appearance in district court, again with counsel, on September 14, 1970, and formally admitted paternity. Defendant was ordered to pay $35 a month for the support of the child as well as to pay the medical and hospital expenses of the mother. Defendant was then 20 years of age, had a high school education, and had been married 10 days.

In November 1972, defendant was cited for contempt for failure to maintain his support payments, having paid only $315 during the 2-year period. In an order dated November 20, 1972, the court ordered defendant to pay an additional $35 a month to apply on the arrearage and continued the matter for 1 year. At the 1972 hearing, defendant appeared without counsel.

Defendant was again cited for contempt for failure to maintain his payments, and appeared before the district court on October 10, 1973, again without counsel. The county attorney appeared on behalf of the state. At that hearing, defendant testified that he was then earning $3.09 an hour working for the city, was paying $91 a month on his home, and $118 a month to the bank on a loan with a balance of about $2,000. In response to questioning, defendant stated that he owned a snowmobile,

a color television, a 1964 Chevrolet, and a 1959 Chevrolet. That disclosure prompted the following colloquy between the county attorney and defendant:

"Q   Okay. Are you keeping up license and insurance on both of them?

"A   No, I don't have insurance on either one of them. That '59 I don't drive. I just hate to even get out on the streets any more because my insurance expired just not too long ago and I haven't had enough money to get insurance.

"Q   And you have had one child of this marriage, of your marriage?

"A   Yes, and it doesn't look anything like [complainant's] baby, that baby and the baby I have do not look alike and I still say it is not my child.

"THE COURT:   Was that case tried?

"A   No, I just pleaded guilty, I wish I hadn't of now.

"THE COURT:   Well,—

"MR. BUSSINGER:   Is there any way we could bring it back in, Your Honor?

"Q   (By Mr. Wendland:) This is the first time you have ever said anything like that, the first time you have ever denied it?

"A   Well, it's really breaking me.

"Q   Well, is that why?

"A   Yes, and I don't believe it's my child."

Thereupon the court agreed to reopen the case and the matter was continued until November 12, 1973.

At the subsequent hearing, defendant appeared with new counsel and testified that when he pled guilty he did not understand he could have had a jury trial. He further stated that about 2 months after he admitted his guilt, a woman who had lived with the mother of the illegitimate child said she was prepared to testify as follows:

"* * * [Y]ou weren't the only one that was down and seen her that night, she had other men down there too."

On cross-examination, defendant was asked:

"Q And the only thing she was able to tell you is that Marlys [the mother] was seeing other friends at her apartment, male friends?

"A Yes.

"Q She wasn't able to tell you, or did not tell you that Marlys was having sexual relations with these men?

"A I didn't even bother to ask."

Defendant again stated that his first attorney failed to advise him that he had a right to a jury trial. Defendant previously stated that although he had only seen the baby at a distance, he did not feel the child looked like him. Finally, he pointed out that he did not have a guardian ad litem when he pled guilty.

At the conclusion of the hearing on November 12, 1973, the court vacated the adjudication of paternity entered on November 12, 1970. The reasons advanced by the trial court in vacating the judgment may be summarized as follows:

(1) Defendant was 20 years of age at the time of the plea, and although he was represented by counsel he had no guardian ad litem.

(2) Defendant alleged his attorney did not advise him of his right to a jury trial.

(3) The illegitimate child did not look like the child subsequently born of his present marriage.

(4) A friend of the mother of the illegitimate child told defendant that the mother was seeing other men at about the time she became pregnant.

As to the first grounds, there was no requirement in the law that defendant be represented by a guardian ad litem when he admitted paternity. He was represented at all stages of that proceeding by an attorney. Although the attorney was not called by either the state or the defendant, in the absence of an acknowledgment by counsel that he failed to advise his client he was entitled

to a jury trial, we are not persuaded he neglected to inform defendant of that fundamental right.

As to the so-called newly discovered evidence that the child did not look like his own, and that the mother of the child was "seeing other men," we are of the opinion it had little or no probative value. In any event, under Rule 60.02, Rules of Civil Procedure, a judgment may not be opened more than 1 year after its entry on the grounds of newly discovered evidence. Here, assuming the period was tolled until defendant became 21, that event occurred not later than September 14, 1971, and these proceedings were not initiated until October 1973.[1]

It seems apparent that the reasons assigned by defendant for vacating the judgment were contrived and that his actual motive was reflected in his admission of October 1973 that he did not have enough money to purchase insurance for his two cars, that he was debt-ridden, and that he wished he had not pled guilty.

At no time between March 12, 1970, when he was served with a warrant, and October 13, 1973, when, for the second time, he was brought in for contempt, did defendant in any manner suggest that he was not the father of the child. The so-called newly discovered evidence was neither newly discovered nor of any substantive value. It is clear that the trial court was sympathetic to defendant's economic plight, which was aggravated by the necessity of supporting the child born out of wedlock. Nevertheless, defendant incurred the responsibilities of marriage at a time when both he and his wife had known for some 6 months that he was charged with being the father of a child born out of wedlock and when, with the assistance of counsel, he acknowledged the child was his and thereafter continued to recognize his responsibility for more than 3 years.

As to the question of taking a blood test, defendant conceded that this lawyer had advised him he had a right to take such a

---

[1] It may be of some significance that by the time the judgment was vacated the age of majority had been reduced from 21 years to 18 years. L. 1973, c. 725.

test but he declined to do so, stating as his reason that he simply wished "to get it over with." At the initial hearing before defendant admitted paternity, the court took great pains to explain to him his responsibility for supporting the child until it reached 21 years of age, and stated that the child was entitled to the same support he would give to a child born of his marriage.

Accordingly, we hold that as a matter of law on this record the judgment of paternity could not under Rule 60.02 be vacated more than a year after defendant became 21, that he has not made a sufficient showing to justify the relief he seeks, and that the interests of justice do not require that the judgment be vacated.

Reversed.